## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

MONTRA JAMIL HURD,                         )
                                    Petitioner,    )
v.                                               )          Case No. CIV-05-559-L
                                                  )
LENORA JORDAN, WARDEN,            )
                                    Respondent.  )

### REPORT AND RECOMMENDATION

Petitioner, a state prisoner appearing *pro se*, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. The matter has been referred for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons set forth below, it is recommended that the Petition be denied.

## I.    Relevant Case History

Petitioner was charged and convicted of First Degree Murder in the District Court of Comanche County, State of Oklahoma, Case No. CF-99-279. Petitioner appealed his conviction to the Oklahoma Court of Criminal Appeals (OCCA). The OCCA affirmed Petitioner's conviction by summary opinion filed March 30, 2004. *See* Response [Doc. # 16], Exhibit H, OCCA Summary Opinion.

The state court proceedings involve a somewhat unique procedural history that merits discussion because that procedural history forms the primary basis of claims asserted by Petitioner in this habeas corpus action. Petitioner was charged with First Degree Murder on

July 13, 1999.[1]   At the time of the offense, Petitioner was sixteen years old.  Pursuant to Oklahoma law, Petitioner would be tried as an adult unless he were successful in obtaining youthful offender status pursuant to Oklahoma's Youthful Offender Act, Okla. Stat. tit. 10, §§ 7306-1.1 *et seq.*

Accordingly, Petitioner made a request for certification as a youthful offender. During the pendency of the preliminary hearing and youthful offender determination, Petitioner twice filed interlocutory appeals seeking writs of mandamus regarding certain rulings made by the state court district judge presiding over those proceedings.  In each instance, the OCCA declined to assume jurisdiction over the matter.[2]  The district judge ultimately denied Petitioner's motion for certification as a youthful offender, and Petitioner immediately appealed that ruling to the OCCA.[3]  During the pendency of that appeal, Petitioner sought intervention from the federal courts by filing a petition for habeas corpus

---

[1]Petitioner shot and killed Hakim Reid on July 11, 1999.  There were a number of eyewitnesses to the crime who testified at trial.  In addition, Petitioner turned himself into the police on July 12, 1999, the day after the crime, and confessed to the shooting during a videotaped police interview.  At trial, Petitioner's counsel did not contest the fact that Petitioner shot Mr. Reid and instead challenged the State's evidence of Petitioner's intent and state of mind at the time of the shooting.

[2]The OCCA's orders in those appeals have not been made part of the record presented in this federal habeas corpus action.  The Court, however, takes judicial notice of the orders.  *See Hurd v. District Court of Comanche County, State of Oklahoma et al.*, Case No. PR-2000-46, Oklahoma Court of Criminal Appeals (April 26, 2000) and *Hurd v. District Court of Comanche County, State of Oklahoma et al.*, Case No. PR-2001-107, Oklahoma Court of Criminal Appeals (March 22, 2001).

[3]Under Oklahoma law, an order denying certification as a youthful offender is a final order appealable when entered.  *See* Okla. Stat. tit. 10, § 7306-2.5(E).

relief pursuant to 28 U.S.C. § 2241.  *See Hurd v. Aycock*, Case No. CIV-01-1201-L, United States District Court for the Western District of Oklahoma.[4]

The OCCA affirmed the trial court's determination denying Petitioner's motion for certification as a youthful offender. *See* Response, Exhibit E, OCCA Accelerated Docket Order. Petitioner was tried as an adult, found guilty of First Degree Murder and sentenced to life imprisonment.

The preliminary hearing and youthful offender proceedings were conducted by a state district judge, the Honorable Keith Aycock, and during that stage of the proceedings, Petitioner was represented by Debbie Maddox.  The Honorable David Lewis, former district judge, presided over the trial,[5] and Petitioner's counsel at trial was Stan Monroe.[6]

Further details regarding the procedural history of this matter are more fully developed in the analysis of the claims.

## II.  <u>Grounds for Federal Habeas Corpus Relief</u>

In this action, Petitioner asserts the following grounds for federal habeas corpus relief:

---

[4]The section 2241 action was originally filed in the United States District Court for the Northern District of Oklahoma on April 23, 2001, and transferred to this judicial district on July 25, 2001. On November 30, 2001, a Report and Recommendation was entered recommending dismissal of the action on abstention grounds, finding that federal court intervention was not proper due to ongoing state court proceedings. The district court adopted the Report and Recommendation by Order entered March 26, 2002.  *See Hurd v. Aycock*, Case No. CIV-01-1201-L, Doc. ## 25 and 35 (also attached to Respondent's Response as Ex. A and Ex. B).

[5]Judge Lewis has since been appointed as a judge to the Oklahoma Court of Criminal Appeals.

[6]Petitioner does not raise any claims of ineffective assistance of counsel.

(1) he was denied his Sixth Amendment right to counsel during police interrogation and during a court-ordered competency hearing;

(2) his Fifth and Fourteenth Amendment due process rights and his Fourteenth Amendment equal protection rights were violated as a result of improper delays resulting in the denial of youthful offender status under Oklahoma law;

(3) his Fifth and Fourteenth Amendment due process rights were violated as a result of the trial court's improper determinations that Petitioner should be tried as an adult and competent person;

(4) his Sixth Amendment right to a speedy trial was violated as a result of court-ordered competency evaluations;

(5) his Fifth Amendment privilege against self-incrimination was violated when the trial court admitted into evidence his videotaped statement to the police, in that his statement was not made knowingly and voluntarily and was admitted into evidence without a hearing conducted pursuant to *Jackson v. Denno*, 378 U.S. 368 (1964);

(6) his Eighth Amendment right to be free from cruel and unusual punishment was violated as a result of the trial court's imposition of an excessive sentence; and

(7) his Fifth and Fourteenth Amendment due process rights were violated as a result of erroneous rulings by the OCCA.

Respondent contends Petitioner has exhausted his state court remedies as to all grounds for relief raised in this action. *See* Response at 1, ¶ 5 ("Petitioner has exhausted his state court remedies."). A review of the record, however, demonstrates that Petitioner raised

only Grounds One through Five on direct appeal of his conviction to the OCCA in addition to other claims for relief not asserted in this action.[7] The OCCA determined that all issues raised on direct appeal of Petitioner's conviction were barred by the doctrine of res judicata as issues that were previously raised and adjudicated in the context of Petitioner's appeal from the trial court's denial of his application to be certified as a youthful offender, Case No. J-2001-765 (*M.J.H. v. State*). *See* Response, Ex. H, OCCA Summary Opinion at 2-3.

The record further demonstrates that Grounds Six and Seven have not been raised in the state courts and are therefore unexhausted. Respondent does not assert the defense of procedural bar as to these claims. As discussed below, these claims are without merit and, therefore, despite Petitioner's failure to exhaust the claims, they should be denied. *See* 28 U.S.C. § 2254(b)(2).

## III.   Timeliness of the Petition

Respondent expresses concern over the timeliness of this action as to the claims that were initially raised in the proceedings related to Petitioner's request for certification as a youthful offender. The OCCA entered its order affirming the district judge's order denying certification as a youthful offender on November 26, 2001. *See* Response, Exhibit E, OCCA Accelerated Docket Order. The instant action was filed on May 19, 2005. The timeliness

---

[7]As to the claims raised in Ground One, however, Petitioner did not raise on direct appeal any claim related to a denial of his Sixth Amendment right to counsel during the police interrogation of him. Similarly, as to the claims raised in Ground Two, Petitioner did not allege any violation of his equal protection rights on direct appeal. *See* Response, Ex. F, Appellant's Brief in Chief, filed on direct appeal. As set forth in the analysis of these grounds for relief, even though these claims are unexhausted, they are now procedurally barred and/or should be denied on the merits. Therefore, review of these additional claims is permissible. *See* 28 U.S.C. § 2254 (b)(2).

of the instant action is governed by 28 U.S.C. § 2244(d)(1)(A) (setting forth one-year limitations period for federal habeas corpus actions).  Respondent is correct that more than one year elapsed prior to Petitioner filing the instant action.  However, pursuant to section 2244(d)(1)(A), the limitations period is triggered by the date on which a state court judgment of conviction becomes final.  There was no judgment issued by the district judge or the OCCA regarding the adult certification issue, and Petitioner's conviction was not final at the time the adult certification issue was determined.  Petitioner has filed this action within one year of the date the judgment of conviction became final.  Therefore, the one-year limitation period prescribed in 28 U.S.C. § 2244(d)(1) does not bar this Court's review of the grounds raised in the Petition.

Moreover, as Respondent has addressed, in the context of Petitioner's section 2241 action, this federal court entered an Order that contemplated Petitioner's ability to return to federal court to challenge issues related to his request for youthful offender certification after the conclusion of the state court proceedings, following entry of the judgment of conviction. The Order reads in pertinent part as follows:

> The Court agrees with the conclusions of the Magistrate Judge that the State retains a legitimate interest in proceeding to trial without interference by this Court and that petitioner cannot point to any current or anticipated improprieties that would require federal intervention in the state court prior to petitioner's trial. . . . The Magistrate Judge's recommendation contemplates that petitioner's federal habeas claims will be considered only upon conclusion of all state proceedings.

*See* Response, Exhibit B, Order, *Hurd v. Aycock*, Case No. CIV-01-1201-L, United States District Court for the Western District of Oklahoma.  Under these circumstances, and

because Respondent concedes the claims raised in the instant Petition are timely, review of the claims should not be barred by 28 U.S.C. § 2244(d)(1).

## IV.    **Standard of Review**

Petitioner's habeas action is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pursuant to the AEDPA, a petitioner is not entitled to habeas corpus relief if his claim has been adjudicated on the merits by the highest state court unless the state court's adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1) & 2254(d)(2).

As the Supreme Court has explained, "[a] state-court decision is contrary to . . . clearly established precedents if [the state court] applies a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result.  A state-court decision involves an unreasonable application of th[e] [Supreme] Court's clearly established precedents if the state court applies th[e] Court's precedents to the facts in an objectively unreasonable manner." *Brown v. Payton*, 544 U.S. 133, 125 S.Ct. 1432, 1438-39 (2005) (internal citations omitted).  A state court's determinations of fact are presumed to be correct unless rebutted by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).

The OCCA opinions, both in the appeal of the district judge's order denying youthful offender certification and on direct appeal of the conviction, were issued without express analysis of the claims asserted by Petitioner. *See* Response, Exhibit E, OCCA Accelerated Docket Order and Exhibit H, OCCA Summary Opinion.  However, pursuant to *Aycox v. Lytle*, 196 F.3d 1174, 1177-1178 (10th Cir. 1999), deference must be given to the state court's *result* even if its reasoning is not expressly stated.  *See also Saiz v. Ortiz* 392 F.3d 1166, 1176 (10th Cir. 2004) ("When applying [AEDPA's] deferential standards in cases involving a state-court summary disposition, we focus on the result of the state court decision, not its reasoning."); *Gipson v. Jordan*, 376 F.3d 1193, 1197 (10th Cir. 2004) ("[W]e defer to the [state appellate court's] decision unless we conclude that its result -- not its rationale -- is legally or factually unreasonable.").  The Court, therefore, applies the AEDPA's deferential standard to the claims addressed by the state courts.

## V.   <u>Analysis</u>

### A.   <u>Ground One -- Sixth Amendment Right to Counsel</u>

In his first ground for relief, Petitioner claims that he was denied the right to counsel at two stages in the state court proceedings in violation of his Sixth Amendment right to counsel.  First, Petitioner claims he was denied the right to counsel during a post-arrest police interrogation. (As set forth, in a separate ground for relief, Petitioner challenges the use of statements obtained from him during this interrogation as violating his Fifth Amendment privilege against self-incrimination; *see* discussion, *infra*, Ground Five).  Second, Petitioner

claims he was denied the right to counsel during a competency evaluation and subsequent competency hearing.

### 1.    **Post-Arrest Police Interrogation**

Although Respondent initially indicates in his Response that all claims have been exhausted, in the context of addressing the claims raised in Ground One, Respondent contends Petitioner failed to raise any Sixth Amendment right to counsel claim related to the police interrogation before the state courts and therefore it is unexhausted. Respondent is correct that the claim was not raised before the state courts and is unexhausted. Nonetheless, Respondent contends that the claim should be denied on the merits. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). Despite Respondent's assertion that this claim should be denied on the merits, the Response lacks any discussion of the merits of this claim.[8]

---

[8]This Court could deem the claim procedurally barred. "[A] federal habeas court can always raise procedural bar *sua sponte*." *Romano v. Gibson*, 239 F.3d 1156, 1168 (10th Cir. 2001) (citations omitted). Under Oklahoma law, the claim would now be procedurally barred. *See Hale v. Gibson*, 227 F.3d 1298, 1328 (10th Cir. 2000) (noting that "Oklahoma bars collateral review of claims . . . that could have been raised on direct appeal but were not"); *see also* Okla. Stat. tit. 10, § 1086. "Although a procedural default may be overcome upon a showing of cause and prejudice or a fundamental miscarriage of justice, *see Coleman v. Thompson*, 501 U.S. 722, 750 . . . (1991), [Petitioner] has not argued that these exceptions to procedural bar are applicable here." *Patton v. Mullin*, 425 F.3d 788, 810 (10th Cir. 2005). In the alternative, however, the Court addresses the merits of the claim. *See id.* ("In the interest of judicial economy, however, we briefly consider the merits of Mr. Patton's claim.") (*citing* 28 U.S.C. § 2254(b)(2) and *Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir. 2000)).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of counsel for his defence." The Sixth Amendment right to counsel is offense-specific and "attaches when formal judicial proceedings, such as a formal charge, preliminary hearing, indictment, information, or arraignment, have been initiated against him." *United States v. Toles*, 297 F.3d 959, 965 (10th Cir. 2002). *See also McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). Once the right to counsel attaches, police may not obtain statements from the accused without the presence of counsel unless the accused affirmatively waives the right to counsel. *Edwards v. Arizona*, 451 U.S. 477, 484-485 (1981).

The record demonstrates that Petitioner voluntarily turned himself in at the Comanche County Sheriff's Office and was then taken into custody and transported to the Lawton Police Department. *See* Preliminary Hearing (PH) Tr. Vol. I at 70-71. At the time of the police interview, no charges had been brought against Petitioner. PH Tr. Vol. I at 92-93. Therefore, Petitioner's Sixth Amendment right to counsel had not yet attached.

Instead, at the time of Petitioner's custodial interrogation, his right to counsel arose under the Fifth Amendment. *See, e.g., Toles v. Gibson*, 269 F.3d 1167, 1180 (10th Cir. 2001) ("The Fifth Amendment right to counsel must be asserted by the accused and it covers interrogation concerning any offense, past or present, charged or uncharged. The Sixth Amendment right is offense-specific and attaches at the time judicial proceedings have been initiated against the accused."). Petitioner has not raised any Fifth Amendment claim based on denial of the right to counsel.

10

Were the Court to liberally construe the Petition as alleging a violation of Petitioner's Fifth Amendment right to counsel, his claim remains meritless.  The record demonstrates that Petitioner was advised of his *Miranda* rights and signed a waiver form agreeing to talk to police without the presence of counsel.  *See* PH Tr. Vol. I at 72-73.  *See also* Preliminary Hearing Exhibits, State's Exhibit 2, Advice of Rights.

Petitioner contends, however, that he suffers from mental retardation and that at the time the police took his statement, he was very tired and under the influence of PCP. Therefore, he contends the waiver of his rights was not made knowingly and voluntarily. However, as discussed fully in relation to Petitioner's fifth ground for relief, the record demonstrates that Petitioner's waiver of his rights was made knowingly and voluntarily**.** Therefore, as an alternative to procedural bar, this claim should be denied on the merits.

### 2.   Competency Evaluation and Competency Hearing

Petitioner further contends that he was denied the right to counsel during a court-ordered competency evaluation and at the competency hearing.  The record demonstrates that counsel was present throughout the competency hearing and, therefore, to the extent Petitioner contends he was denied his Sixth Amendment right to counsel during the competency hearing, this claim is without merit.  *See* Competency Hearing (CH) Tr. Vols. I-V.  As to the alleged denial of counsel during the competency evaluation, a discussion of the procedural and factual history surrounding the issue of competency in the course of the state court proceedings is necessary.

The State filed an Application for Determination of Competency on December 28, 1999.  *See* Hearing on Application for a Competency Evaluation (App. CE) Tr. at 2.   The Application was filed in the course of the preliminary hearing proceedings and pursuant to Okla. Stat. tit. 22, §§ 1175 *et seq*.   App. CE at 3-4.   Defense testimony presented in the course of the preliminary hearing to the effect that Petitioner suffered from mental retardation -- and, therefore, might be incompetent to stand trial -- prompted the filing of the State's Application.  *See* App. CE at 6-7, 16-17; *see also* PH Tr. Vol. II and Vol. III, Testimony of Drs. Lipman, Smith and Beyer.  The district judge sustained the State's application following a hearing held on January 3, 2000.  *See* App. CE at 24-27.

Dr. Jeanne Russell, Director of Psychology, Eastern State Hospital, conducted the court-ordered competency evaluation and submitted the results of her competency evaluation to the district judge on August 25, 2000.  Dr. Russell opined that Petitioner was competent.  *See* CH Tr. Vol. IV, Exhibits, State's Exhibit 1, Russell Report.  Defense counsel was present for this evaluation.  *See id*. at 1 ("I met with the defendant on two occasions, both in the presence of his attorney, Debbie Maddox.").   Dr. Russell's report reflects that defense counsel played an active role during the evaluation and limited the nature and form of the questions asked.  *Id*.

In response to Dr. Russell's evaluation, defense counsel requested a non-jury trial on the issue of Petitioner's competency.  At the competency hearing, the district judge heard testimony from three expert witnesses.  Dr. Drogin testified on behalf of the defense and opined that Petitioner was not competent to stand trial.  CH Tr. Vol. I at 90.  Following the

presentation of his testimony, the defense rested.  CH Tr. Vol. I at 150-151.  Dr. Russell then testified on behalf of the State and opined that Petitioner was competent.  CH Tr. Vol. I at 176.  Defense counsel then called Dr. Smith as a rebuttal witness on behalf of the defense.  Dr. Smith, consistent with Dr. Drogin, opined that Petitioner was not competent.  CH Tr. Vol. II at 279.

The record demonstrates that defense counsel was present on behalf of Petitioner during each of the evaluations conducted by Dr. Drogin (CH Tr. Vol. I at 20-21), Dr. Russell (CH Tr. Vol. I at 158-159, 173) and Dr. Smith (CH Tr. Vol. II at 293).  Dr. Russell testified, however, that her evaluation was not complete because defense counsel had instructed Petitioner not to answer certain questions and as a result, Dr. Russell elected to terminate her interview of Petitioner.  *See* CH Tr. Vol. IV, Exhibits, State's Exhibit 1, Russell Report.  *See also* CH Tr. Vol. I at 163, 166-167, 174-176, 200-202.

At the conclusion of the evidence, the Court inquired of the State whether a further interview by Dr. Russell would be helpful.  CH Tr. Vol. II at 296-297.  The State subsequently moved for a supplemental competency evaluation and over objection of defense counsel, the district judge granted the State's request.  *See* CH Tr. Vol. III at 332.  The district judge gave defense counsel the following admonition regarding this supplemental competency evaluation:

> I want the evaluation to be conducted in the manner that is routinely conducted by the folks at the Eastern State Hospital.  They have a procedure they follow.

13

You know, they're going to keep him for a period of time, or whatever length of time they deem is appropriate, to make this evaluation, and I'm sure that a part of that is going to include interviews.

Now, you have addressed the issue.  Do you want to travel to Eastern State and be there?  In fact, you have advised the Court this morning that you intend to instruct Mr. Hurd not to answer those questions.

Ms. Maddox, if you do that, then we won't be talking about intervening at that point, we will be talking about interfering.  And unless the Court of Criminal Appeals determines that you have that right, I'm ordering you not to do that.  You shall not interfere.

CH Tr. Vol. III at 330-331.

Defense counsel then filed a Notice of Invocation of Constitutional Rights With Respect To Competency Determination directed to Eastern State Hospital.  *See* CH Tr. Vol. V, Defendant's Exhibit 1.  That Notice includes an objection to "[a]ny interview, questioning, interrogation, or other verbal or written communication or its functional equivalent of defendant related to the allegations of commission of crime made against him in the above-styled and numbered case, and any matters which might reasonably be related to the above-styled action."  *See* CH Tr. Vol. V, Defendant's Exhibit 1.

Dr. Roberson, on behalf of Eastern State Hospital, conducted the supplemental court-ordered competency evaluation.  CH Tr. Vol. V at 362-363.  Defense counsel was not present during this supplemental evaluation.  CH Tr. Vol. V at 345-347.  Dr. Roberson testified that he spent approximately twenty minutes talking directly with Petitioner.  In addition, he observed Petitioner interacting with another psychologist for another twenty minutes.  CH Tr. Vol. V at 365-366.  Dr. Roberson testified that Petitioner told him he had been instructed

14

by defense counsel not to participate in any evaluation procedure. CH Tr. Vol. V at 363-364.
Dr. Roberson opined that Petitioner was not mentally retarded and concluded that Petitioner
was competent. *See, e.g.*, CH Tr. Vol. V at 399, 426-429.[9]

Following presentation of this evidence, the district judge then issued his ruling and
found Petitioner was competent to stand trial. CH Tr. Vol. V at 453-460.

Based on the record of the state court competency proceedings, Petitioner's alleged
Sixth Amendment denial of the right to counsel is limited to the supplemental competency
evaluation conducted by Dr. Roberson. The record clearly demonstrates that defense counsel
was present at the previous competency evaluations conducted by Drs. Drogin, Russell and
Smith.

In *Estelle v. Smith*, 451 U.S. 454 (1981), the United States Supreme Court held that
the Sixth Amendment right to counsel requires that a criminal defendant be given a prior
opportunity to consult with counsel about participation in a psychiatric evaluation and to
what end the findings of that evaluation could be employed in criminal proceedings. *Id*. at
470-471. In *Estelle*, the Court deemed the defendant's Sixth Amendment rights to have been
violated because the psychiatric evaluation of the defendant had encompassed the issue of
the defendant's future dangerousness and the defendant had not been given the benefit of his
counsel's advice prior to the examination. *Id*. The Court reasoned that the "guiding hand

---

[9]Dr. Roberson prepared and submitted a report to the district judge. CH Tr. Vol. V at 364.
That report, however, has not been made a part of the record presented to this Court for federal
habeas review.

of counsel" was important in this context so that the defendant could properly understand the "precise scope, the nuances, and the boundaries of his Fifth Amendment privilege." *Id*. at 471 (quotations and citation omitted).

The Supreme Court did not address the issue raised here, whether the Sixth Amendment right to counsel requires counsel's actual presence during the examination. The defendant in *Estelle* had not argued that such a right exists. As the Court noted:

> Respondent does not assert, and the Court of Appeals did not find, any constitutional right to have counsel actually present during the examination. In fact, the Court of Appeals recognized that "an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination."

*Id*. at 470 n. 14 (citation omitted).[10]

Courts to examine the issue following *Estelle v. Smith* have analyzed whether a competency evaluation constitutes a "critical stage" of the proceedings. A critical stage of the proceedings is defined as one that holds significant consequences for the accused. *United States v. Collins*, 430 F.3d 1260, 1264 (10th Cir. 2005) *citing Bell v. Cone*, 535 U.S. 685, 695-696 (2002). "Thus, a defendant is entitled to counsel at any proceedings where an attorney's assistance may avoid the substantial prejudice that could otherwise result from the proceeding." *Id*. (*citing Coleman v. Alabama*, 399 U.S. 1, 9 (1970)).

Under the facts and circumstances of this case, assuming the supplemental evaluation constituted a critical stage, Petitioner has failed to demonstrate a violation of his Sixth

---

[10]As noted, from the perspective of Dr. Russell, defense counsel's presence and her refusal to permit certain areas of questioning interfered with Dr Russell's evaluation of Petitioner.

16

Amendment rights.  Although counsel was not physically present during Dr. Roberson's supplemental competency evaluation, the record clearly demonstrates that counsel instructed Petitioner not to participate in the evaluation and that Petitioner refused to discuss information about the crime in the course of the supplemental evaluation.  Moreover, as set forth above, counsel filed a Notice of Invocation of Constitutional Rights With Respect To Competency Determination detailing those areas about which Petitioner was not to be questioned.  There is no indication that Petitioner was denied the assistance of counsel for purposes of protecting those Fifth Amendment rights which were the focus of the Supreme Court's concern in *Estelle v. Smith*.  Important, too, is the fact that counsel was physically present for three of the four competency evaluations.  Thus, as a whole, counsel was able to provide assistance to Petitioner in the course of his evaluations. Accordingly, Petitioner's first ground for relief should be denied.

**B.   Ground Two -- Improper Delay as Violating Petitioner's Due Process Rights**

In his second ground for relief, Petitioner contends that improper delay resulting from the court-ordered competency evaluations violated his due process rights by seriously prejudicing his ability to be tried as a youthful offender. Petitioner presented this claim on appeal from the district judge's denial of his motion for certification as a youthful offender, and the OCCA denied the claim.   The OCCA majority opinion issued without an express analysis of the claim. *See* Response, Exhibit E, OCCA Accelerated Docket Order.  However, the issue of delay was expressly addressed in the special concurrences of Judge Lumpkin and

17

Judge Strubhar.  The issue of delay was also thoroughly analyzed in the dissenting opinion of Judge Chapel. Petitioner raised the claim again on direct appeal of his conviction, and the OCCA deemed the claim barred by the doctrine of res judicata because it had previously been raised and adjudicated.  *See* Response, Exhibit H, OCCA Summary Opinion.

Petitioner's claim of prejudicial delay relates exclusively to the time period between the commencement of the competency proceedings and the district judge's determination to deny the motion for certification as a youthful offender.  As explained below, this time period encompasses approximately 17 months.

The crux of Petitioner's due process claim turns on the district judge's decision to grant the State's application for a competency evaluation prior to making a determination on Petitioner's motion for certification as a youthful offender.   According to Petitioner, it was improper to "interrupt" the youthful offender proceeding to conduct a court-ordered competency evaluation.

Oklahoma's Youthful Offender Act provides that  if a person aged thirteen through seventeen is charged with first degree murder, that person "shall be held accountable for his acts as if he were an adult."  However, the Act further provides that the person "may be certified as a youthful offender or juvenile . . . ."  Okla. Stat. tit. 10, § 7306-2.5(A).   The applicable procedure requires the accused person to file a motion for certification as a youthful offender or juvenile before the start of the preliminary hearing.  Okla. Stat. tit. 10, § 7306-2.5(C)(1).  At the conclusion of the state's case at the preliminary hearing, the accused person may offer evidence to support the motion for certification. *Id*., § 7306-

18

2.5(C)(2).  The court must rule on the certification motion "before ruling on whether to bind

the accused over for trial."  *Id.*, § 7306-2.5(D).  The following factors govern the trial court's

decision on whether to grant the certification motion:

> 1. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;
>
> 2. Whether the offense was against persons, and, if personal injury resulted, the degree of personal injury;
>
> 3. The record and past history of the accused person, including previous contacts with law enforcement agencies and juvenile or criminal courts, prior periods of probation and commitments to juvenile institutions;
>
> 4. The sophistication and maturity of the accused person and his capability of distinguishing right from wrong as determined by consideration of his psychological evaluation, home, environmental situation, emotional attitude and pattern of living;
>
> 5. The prospects for adequate protection of the public if the accused person is processed through the youthful offender system or the juvenile system;
>
> 6. The likelihood of reasonable rehabilitation of the accused person if he is found to have committed the alleged offense, by the use of procedures and facilities currently available to the juvenile court; and
>
> 7. Whether the offense occurred while the accused person was escaping or on escape status from an institution for youthful offenders or delinquent children.

*Id.*, § 7306-2.5(D)(1)-(7).

Petitioner filed a motion for youthful offender certification on August 9, 1999, and

a second motion on September 22, 1999.  The preliminary hearing commenced on September

24, 1999.  PH Tr. Vol. I.  At the conclusion of the State's evidence, the district judge

overruled defense counsel's demurrer and set December 2, 1999, as the date for the hearing on Petitioner's motion for youthful offender certification.  *See* PH Tr. Vol. I at 125-127.

On December 2, 1999, defense counsel began presentation of evidence on the motion for certification as a youthful offender.  *See* PH Tr. Vol. II at 134.  During the second day of the hearing, the defense presented expert witness testimony that Petitioner suffered from mental retardation.  *See*, *e.g.,* PH Tr. Vol. II at 174 (Dr. Lipman) ("[P]etitioner had a very clear intellectual deficit."); Tr. Vol. III at 271 (Dr. Smith) ("[P]etitioner is very limited intellectually."); Tr. Vol. III at 348-355 (Dr. Beyer) (discussing Petitioner's intellectual and cognitive limitations).  The testimony was offered to demonstrate, as pertinent to the fourth factor governing youthful offender certification, the level of Petitioner's "sophistication and maturity" and his "capability to distinguish right from wrong."  Okla. Stat. tit. 10, § 7306.2.5(D)(4).

Because of the presentation of this testimony, a concern arose as to Petitioner's competency to stand trial.  *See* PH Tr. Vol. III at 406-407.  On December 28, 1999, the State, invoking the provisions of Okla. Stat. tit. 22, §§ 1175.1 *et seq*., filed an application for a determination of competency.  *See* App. CE at 2.  On January 3, 2000, the district judge conducted a hearing on the application, granted the State's request and ordered Petitioner to undergo a competency evaluation.  *See* App. CE at 25-27.  As a consequence, the determination of youthful offender status was stayed.

Defense counsel vehemently objected to the district judge's order for a competency evaluation prior to completion of the determination of youthful offender status.  Defense

counsel argued that due to Petitioner's age, he was presumed to be incompetent and that a determination of competency would be appropriate only after the district judge had made the determination of youthful offender status. App. CE at 7-15, 17-20.  The district judge recognized the implications of ordering the competency evaluation at this procedural stage of the proceedings, and the lack of relevant Oklahoma legal precedent to guide his decision, but ordered the competency evaluation to proceed.  App. CE at 24-27.

Following the district judge's order for a competency evaluation, on January 14, 2000, defense counsel filed an alternative writ of prohibition and/or mandamus to the OCCA, seeking as relief an order from the OCCA to prohibit the competency evaluation from going forward.  The trial court proceedings were stayed during the pendency of this appeal.  On April 26, 2000, the OCCA declined to assume jurisdiction over the matter finding:

> The Court, having examined the Petitioner's Application to Assume Original Jurisdiction and the Response of Respondents, and being fully advised in the premises, finds Petitioner has not demonstrated Respondent(s) is exercising judicial power that is unauthorized by law.  Such is a prerequisite for the writ of prohibition. [Citation omitted].[11]

The trial court proceedings then resumed.  As set forth previously in relation to Petitioner's first ground for relief, on August 25, 2000, State examiner Dr. Russell submitted the results of her competency evaluation and opined that Petitioner was competent.  Defense counsel then moved for a non-jury hearing on the issue of competency.

---

[11]*See Hurd v. District Court of Comanche County, State of Oklahoma et al.,* Case No. PR-2000-46, Oklahoma Court of Criminal Appeals (April 26, 2000).

The competency hearing proceeded on November 29 and December 21, 2000.  CH Tr. Vol I and II.  On January 11, 2001, following the presentation of this evidence, the State filed a motion for further competency evaluation.  On January 26, 2001, the district judge held a hearing on the State's motion, sustained that motion and ordered a supplemental competency evaluation to be conducted by the State.  In response, Petitioner sought an alternative writ of prohibition and/or mandamus before the OCCA to prohibit the supplemental competency evaluation.  On March 22, 2001, the OCCA again declined to assume jurisdiction.  On March 27, 2001, Petitioner was committed to Eastern State Hospital for the supplemental competency evaluation.  The supplemental competency evaluation was completed on April 23, 2001, and following submission of further testimony related to the supplemental evaluation, on June 4, 2001, the district judge found Petitioner competent to stand trial.  *See* CH Tr. Vol. V at 364, 459-460.  Following that determination, the district judge proceeded with the hearing for purposes of making a determination as to whether Petitioner should be certified as a youthful offender.  *See* PH Tr. Vol. IV.

On June 7, 2001 -- approximately 17 months following the district court's decision to proceed with a competency evaluation -- the district judge made findings pursuant to the statutory factors governing youthful offender certification.  *See* PH Tr. Vol. V at 514-541.  The district judge denied the motion for certification as a youthful offender.  PH Tr. Vol. V at 541. The district judge further ruled that the evidence presented in the course of the preliminary hearing was sufficient  on the charge of murder in the first degree and ordered

that Petitioner stand trial on that charge. PH Tr. Vol. V  at 541. Petitioner's due process challenge on the issue of delay concerns only proceedings up to this point.[12]

As an initial matter, this Court must address whether Petitioner has a cognizable due process claim arising out of the alleged prejudicial delay in the district judge's youthful offender certification determination.   Juvenile court systems are creatures of state legislatures.   There is no federal constitutional right to be tried as a juvenile or youthful offender.   *See, e.g., United States v. Juvenile*, 228 F.3d 987, 990 (9th Cir. 2000); *see also Penn v. Attorney General of State of Alabama*, 930 F.2d 838, 843 (11th Cir. 1991) (option to have case transferred to juvenile court was only a privilege not a constitutional right); *Stokes v. Fair*, 581 F.2d 287, 289 (1st Cir. 1978) ("[T]here is no constitutional right to any preferred treatment as a juvenile offender." ); *United States ex rel. Martin v. Gramley*, No. 98 C 1984, 1998 WL 312014 at *1 (N.D. Ill. June 3,1998) (unpublished op.) ("Petitioner had no constitutional right to be tried and punished as a juvenile."); *Alford v. Carter*, 504 P.2d 436, 439 (Okla. Crim. App. 1972) ("[A] person has no constitutional right to be tried as a juvenile at any certain age.") (*citing Broadway v. Beto*, 338 F. Supp. 827 (N.D. Tex. 1971), *aff'd* 459 F.2d 483 (5th Cir. 1972)).

---

[12]A brief recitation of the subsequent procedural history nonetheless is included for contextual purposes only.  On June 14, 2001, defense counsel moved to stay formal arraignment during the pendency of Petitioner's appeal to the OCCA of the district judge's order denying certification as a youthful offender, and the district judge granted the request, noting the ramifications of such request on Petitioner's speedy trial rights.  *See* Transcript of Motion to Stay Formal Arraignment.  The OCCA entered its order affirming the district judge's denial of youthful offender certification on November 26, 2001.  *See* Response, Exhibit E.  Petitioner's jury trial on the charge against him was held in September 2002.  Trial Tr. Vols. I-III.

Proceedings governing youthful offender certification, therefore, are a matter of state law.[13] Thus, whether the competency evaluations were proper at the stage in the proceedings during which they were ordered does not implicate any federal constitutional right. As set forth above, when the OCCA twice denied Petitioner's writ of prohibition with respect to the court-ordered competency evaluations, the OCCA declined jurisdiction on the ground that the district judge was "not exercising judicial power unauthorized by law." Therefore, the OCCA determined, as a matter of state law, that the procedure was proper. No federal constitutional rights were violated as a result of the court-ordered competency evaluations.

Petitioner maintains, however, that his due process rights were violated as a result of the delays occasioned by the competency proceedings. By the time the district judge issued his ruling on Petitioner's motion for certification as a youthful offender, he was 18 ½ years old. According to Petitioner, the sole reason the district judge denied his motion for certification was due to Petitioner "aging out." In other words, Petitioner contends that he was no longer eligible for the rehabilitative programs provided through the Oklahoma Office of Juvenile Affairs (OJA) because he was too old to benefit from those programs. The aging out issue relates to factor five (adequate protection to the public) and factor six (reasonable

_____

[13]Certainly, the United States Supreme Court has recognized that certain constitutional protections attach to juvenile proceedings. *See In Re Gault*, 387 U.S. 1 (1967) and *In Re Winship*, 397 U.S. 358 (1970) (juveniles are entitled to appropriate notice, to counsel, to confrontation and cross-examination, to a privilege against self-incrimination, and to a standard of proof beyond a reasonable doubt). However, no denial of these rights is implicated by the district judge's order requiring Petitioner to undergo a competency evaluation.

rehabilitation) of the statutory factors governing youthful offender certification.  *See* Okla. Stat. tit. 10, § 7306-2.5(D)(5) and (6).

Evidence at the preliminary hearing on Petitioner's motion for certification as a youthful offender suggested that if Petitioner were certified as a youthful offender, he would not have enough time to complete the recommended OJA treatment program because he was closely approaching 19 years of age.  PH Tr. Vol. IV at 466-469.  At the time of the hearing, Oklahoma's Youthful Offender Act provided that a person sentenced as a youthful offender would be placed in the custody or under supervision of the OJA and would be discharged from OJA custody or supervision at the latest, by the time the person reached 19 years of age. *See* Okla. Stat. tit. 10, §§ 7306-2.4 and 7306-2.10 (Supp. 2000) and (2001).

However, when the district judge ruled on Petitioner's motion for certification as a youthful offender, the judge expressly stated that in making the determination, he would not consider whether administrative problems associated with Petitioner's age would preclude him from being a candidate for youthful offender status.  PH Tr. Vol. V at 515-516.  The district judge relied on *V.J.A. v. State of Oklahoma*, 993 P.2d 773 (Okla. Crim. App. 1999).[14]

---

[14]In that case, the OCCA held that it was error for the trial court to have denied a juvenile's request for certification as a youthful offender based solely on the fact that she would soon reach 19 years of age, the OJA would not be able to retain custody of her past the age of 19 and, therefore, she would be unable to complete the required treatment before being released. *Id*. at 775. The Court rejected the State's contention that OJA is unable to retain individuals within the system past the age of 19 as not supported by the governing statutory language. *Id*. at 776.

Relying on *V.J.A.*, the district judge stated:

> With regard to VJA, it's my understanding it's the opinion of our Court of Criminal Appeals that if this Court finds Mr. Hurd to be a youthful offender, then
>
> (continued...)

Instead, the district judge considered the other statutory factors and determined that Petitioner's request for youthful offender certification should be denied.   The district judge found the offense was committed "in an aggressive, violent, premeditated or willful manner"; the offense was against a person and resulted in death; the nature of Petitioner's other offenses had increased in their severity; Petitioner was mildly mentally retarded but that  he had the "sophistication and maturity necessary for him to know and to distinguish right from wrong when he shot and killed [the victim]"; and although Petitioner could rehabilitate himself, past history demonstrated he had not "learned the lessons taught to him" about rehabilitation.  PH Tr. Vol. V at 516-541.  The district judge expressly stated that he was not giving any one factor greater weight than others.   PH Tr. Vol. V at 539.   The record demonstrates, therefore, that Petitioner's claim of prejudice is without evidentiary support. The very factor Petitioner contends resulted in a prejudicial determination was expressly not considered by the district judge as a basis for denying youthful offender certification.

---

[14](...continued)
that is to be done without regard to any of the administrative limitations or procedures of the Office of Juvenile Affairs.  That's what the case says and so I'm really not, I guess, persuaded by or concerned by the testimony of Mr. Butler and Mr. Miller concerning the limitations of OJA and whether then those limitations would somehow preclude him from being a candidate for youthful offender status.

Because according to this case, that is not to be a consideration and it is not a consideration to this Court.  He either is or he is not a youthful offender as that definition is set forth in the statutes, in case law arising thereunder.

And any administrative problems that the Office of Juvenile Affairs has with maintaining custody of Mr. Hurd for such period of time as would be necessary for him to complete a treatment program simply is not to be considered by this Court and therefore is not.

PH Tr. Vol. V at 515-516.

On direct appeal (*see* Response, Exhibit F, Direct Appeal Brief at 11), Petitioner argued that his due process claim of prejudicial delay should be analyzed pursuant to the factors governing the analysis of a Sixth Amendment violation of a defendant's right to a speedy trial. *See Barker v. Wingo*, 407 U.S. 514 (1972) (identifying factors as: (1) length of the delay; (2) reason for the delay; (3) the accused's assertion of the right to a speedy trial; and (4) whether the accused was prejudiced by the delay).  Assuming the *Barker* analysis governs this claim, Petitioner has failed to establish a violation of his due process rights.

**Length of Delay**

As set forth above, the competency proceedings resulted in a delay of approximately 17 months. Delay exceeding one year is deemed presumptively prejudicial and triggers analysis of the remaining *Barker* factors.  *United States v. Batie*, 433 F.3d 1287, 1290 (10th Cir. 2006).

**Reasons for the Delay**

"The reason for a delay weighs against the government in proportion to the degree to which the government caused the delay."  *Id*. at 1291.  The record demonstrates that Petitioner's actions contributed significantly to the delay accompanying the competency evaluations.  Petitioner filed two separate applications for writs of prohibition during the pendency of the competency proceedings which stayed those proceedings for a total of nearly five months.  In addition, Petitioner's request for a non-jury hearing on the issue of competency, to allow him to challenge the initial competency evaluation, resulted in proceedings spanning approximately two months.

The primary delay associated with actions by the State relate solely to the State's request for a supplemental competency evaluation.  The State requested the supplemental evaluation by motion filed on January 11, 2001.  The district judge sustained the motion on January 26, 2001. Due to Petitioner's filing of a writ of prohibition, the trial court proceedings were stayed through March 22, 2001, when the OCCA entered its order declining to assume jurisdiction.  On March 27, 2001, the district judge ordered that Petitioner be committed to Eastern State Hospital for a supplemental competency evaluation. That evaluation was completed on April 23, 2001, *see* CH Tr. Vol. V at 364, and the district judge issued his ruling that Petitioner was competent to stand trial on June 4, 2001.  CH Tr. Vol. V at 455-460.  Three days later, on June 7, 2001, the district judge denied Petitioner's request for certification as a youthful offender.  PH Tr. Vol. V at 514-541.  The delays occasioned by the State, therefore, are not significant and on balance do not weigh heavily against the State.[15]

---

[15]Moreover, under Tenth Circuit precedent, a substantive due process claim based on delay in proceeding to trial requires a showing of affirmative misconduct by the government. *See Batie*, 433 F.3d at 1293.  The record of the proceedings in the federal habeas action brought pursuant to 28 U.S.C. § 2241 indicates that Petitioner's counsel believed the prosecutor and the district judge engaged in misconduct by colluding to require the supplemental competency evaluation. *See generally*, Response, Exhibit A, *Hurd v. Aycock*, Case No. CIV-01-1201-L, Report and Recommendation at 14-18.  However, the OCCA determined the supplemental competency evaluation was a proper exercise of the district judge's authority.  Moreover, Petitioner has failed to include in this habeas action any specific factual allegations or evidence to demonstrate misconduct by the prosecutor.

### Assertion of the Due Process Right

The next factor in the *Barker* analysis requires the Court to examine whether Petitioner's behavior during the course of litigation evinced a desire to have the youthful offender determination reached with dispatch. *Batie*, 433 F.3d at 1291 *citing Barker*, 407 U.S. at 536 ("Barring extraordinary circumstances, we would be reluctant indeed to rule that a defendant was denied this constitutional right on a record that strongly indicates, as does this one, that the defendant did not want a speedy trial.").  Clearly, both the preliminary hearing transcript and the competency hearing transcript demonstrate that Petitioner strenuously argued that for purposes of his motion for certification as a youthful offender, time was of the essence.  Yet, but for Petitioner's challenge to the competency evaluation, that determination would have been made months sooner.  While sympathetic to the catch twenty-two scenario Petitioner faced, challenges to the court-ordered competency evaluation and supplemental competency evaluation -- procedures upheld by the OCCA -- significantly contributed to the delay in the trial court's determination of youthful offender status.  This factor, therefore, weighs against Petitioner.

### Prejudice

The final factor in the *Barker* analysis requires the Court to consider prejudice.  In the context of a Sixth Amendment claim, prejudice must be viewed "in light of the particular evils the speedy trial right is intended to avert: pretrial incarceration; . . . anxiety and concern of the accused; and . . . the possibility that the defense will be impaired." *Batie*, 433 F.3d at 1292 (internal quotations and citation omitted).  In the context of a due process claim,

however, and in the particular circumstances of this case, the prejudice claimed by Petitioner, as explained above, is that he "aged out" and he fails to identify any other prejudice. As discussed above, Petitioner's claim of prejudice is without evidentiary support.

On balance, therefore, Petitioner has failed to demonstrate a due process violation occasioned by the court-ordered competency evaluations which delayed the trial court's determination of his motion for certification as a youthful offender. Therefore, to the extent Petitioner has raised a cognizable constitutional claim, he has failed to demonstrate a due process violation and Ground Two of the Petition should be denied.[16]

### C.    Ground Three -- Competency and Youthful Offender Determinations

In his third ground for relief, Petitioner claims the district judge's determinations that he should "be tried as an adult and competent person" constituted an abuse of discretion and violated his federal constitutional rights to due process. Petitioner's claim is, in essence, a challenge to the sufficiency of the evidence to support the district judge's competency determination and youthful offender determination.

Respondent contends Petitioner has not raised any federal constitutional issues and that his challenge to the sufficiency of the evidence presents only issues of state law. *See* Supplemental Response [Doc. #26], Proposition I, at 1-9. Respondent is correct that Petitioner has never raised a federal due process claim with respect to the sufficiency of the

---

[16]Petitioner also contends that his equal protection rights have been violated. He makes this claim in the most conclusory fashion, unsupported by any facts, and a review of the state court proceedings reveals this claim was never presented there. Accordingly, any equal protection challenge should be denied.

evidence in support of the youthful offender determination.   However, the record

demonstrates Petitioner has challenged the state court's competency determination on federal

due process grounds.   *See* Response, Exhibit F, Appellant's Brief in Chief at 18 ("For the

district judge to find competency against the weight of the evidence is a denial of due process

under the Fourteenth Amendment.").

When reviewing the sufficiency of the evidence on a habeas corpus petition, the court

must determine "whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in

original). This standard reflects the "longstanding principle that it is the jury's province to

weigh the evidence and to draw reasonable inferences from testimony presented at trial."

*Turrentine v. Mullin*, 390 F.3d 1181, 1197 (10th Cir. 2004).   Thus, the standard on habeas

review is "'sharply limited' and a court 'faced with a record of historical facts that supports

conflicting inferences must presume – even if it does not affirmatively appear in the record --

that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer

to that resolution.'" *Messer v. Roberts*, 74 F.3d 1009, 1013 (10th Cir.1996) (quoting *Wright

v. West*, 505 U.S. 277, 296-97 (1992)).[17]

---

[17]The Tenth Circuit has not yet settled whether a challenge to the sufficiency of the evidence
on a habeas petition is a question of fact or a question of law, and therefore whether 28 U.S.C.
§ 2254(d)(1) or § 2254(d)(2) should apply.  Under either standard, however, Petitioner's claim fails
and therefore this Court need not decide the question.  *See Hamilton v. Mullin*, 436 F.3d 1181, 1194
(10th Cir. 2006).

## 1.   __Youthful Offender Determination__

In the youthful offender proceedings, Petitioner challenged the sufficiency of the evidence related to the youthful offender determination on state law grounds only.  *See* Response, Exhibit C, Petitioner's Application for Accelerated Docket - Fast Track at 2-8. Similarly, on direct appeal, Petitioner did not claim a due process violation with respect to the sufficiency of the evidence related to the youthful offender determination.  *See* Response, Exhibit F, Appellant's Brief in Chief at 15-18.   Therefore, Petitioner has failed to raise a cognizable claim on federal habeas review related to the youthful offender determination. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (stating that federal habeas relief is only available upon a showing that a conviction violated federal law and review "does not lie for errors of state law") (*quoting Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).[18]

Even if this Court were to consider Petitioner to have adequately challenged the sufficiency of the evidence on due process grounds, his claim would fail.  In both the youthful offender appeal and the direct appeal of Petitioner's conviction, his sole challenge to the sufficiency of the evidence was based upon the admission of evidence related to Petitioner's "aging out."

Petitioner failed to discuss, however, the additional statutory criteria the district judge considered.  As detailed in the discussion of Petitioner's second ground for relief, the record

---

[18]To the extent the federal claim was not raised in the state court proceedings, it is also unexhausted.  However, the claim is without merit and can be denied without exhaustion.  *See* 28 U.S.C. § 2254(b)(2).

demonstrates the district judge received evidence and made thorough findings as to each of the statutory criteria. *See* PH Tr. Vol. V at 514-541. Petitioner has failed to demonstrate that these findings are not supported by the evidence. At best, Petitioner's challenge amounts to a request to reweigh the evidence or second guess the credibility determinations of the state courts, a function inappropriate for a court to engage in on federal habeas review. *See, e.g., Lucero v. Kerby*, 133 F.3d 1299, (10th Cir. 1998) (in determining the sufficiency of the evidence in a federal habeas action, the court may not weigh conflicting evidence nor consider the credibility of witnesses but must accept the jury's resolution of the evidence as long as it is within the bounds of reason) (*quotations and citation omitted*). Therefore, Petitioner's challenge to the sufficiency of the evidence in support of the district judge's youthful offender determination is without merit and should be denied.

### 2.     Competency Determination

Petitioner also challenges the sufficiency of the evidence in support of the district judge's determination that he was competent to stand trial. Petitioner contends he is mentally retarded, functions as a seven- or eight-year-old, has a clinically deficient memory and no ability to perform abstract reasoning.[19]

---

[19]Petitioner raises a substantive, not procedural, due process claim, *i.e.*, that he was tried and convicted while, in fact, incompetent. *See, e.g., Bryan v. Gibson*, 276 F.3d 1163, 1169-1170 (10th Cir. 2001). Significantly, Petitioner's competency was an issue -- initially raised by the district judge -- in the context of the preliminary hearing. The record demonstrates that Petitioner's counsel never further challenged Petitioner's competency to stand trial following that determination.

The test as to whether a defendant is competent to stand trial is whether the defendant has a "sufficient present ability to consult his lawyer with a reasonable degree of rational understanding – and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402, (1960).  Oklahoma has incorporated this test in its statutory definition of competency.[20]

"[A] defendant lacks the requisite rational understanding if his mental condition precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him."  *Lafferty v. Cook*, 949 F.2d 1546, 1550 & n.2 (10th Cir. 1991).  "[S]ufficient contact with reality" is thus, the "touchstone for ascertaining the existence of a rational understanding."  *Id.*

The fact that a defendant is mentally retarded does not necessarily mean he is not competent.  As the United States Supreme Court has noted:

> Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial.  Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others . . . .  Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Atkins v. Virginia*, 536 U.S. 304, 318 (2002).  And the Tenth Circuit Court of Appeals, too, "has long recognized that the presence of some degree of mental disorder in the defendant

---

[20]*See* Okla. Stat. tit. 22, § 1175.1 (defining "competency" as "the present ability of a person arrested for or charged with a crime to understand the nature of the charges and proceedings brought against him or her and to effectively and rationally assist in his or her defense").

does not necessarily mean that he is incompetent to assist in his own defense." *Bryan v. Gibson*, 276 F.3d 1163, 1170-1171 (10th Cir. 2001) (internal quotations and citation omitted).

As previously set forth, the district judge granted the State's application requesting that Petitioner undergo a competency evaluation, and pursuant to court order, Dr. Jeanne Russell, Director of Psychology, Eastern State Hospital, submitted a report dated August 25, 2000, detailing her findings based upon her evaluation of Petitioner.  *See* CH Tr. Vol. IV, Exhibits for the Competency Hearing, State's Exhibit 1.  Dr. Russell opined that Petitioner both appreciated the nature of the charges against him and was able to consult with his lawyer and rationally assist in the preparation of his defense.  In reaching this opinion, Dr. Russell relied upon her interviews of Petitioner and interviews of persons from Southwest Juvenile Center including three of Petitioner's former teachers, the principal and a school psychologist.[21]  Dr. Russell also reviewed reports by defense experts, Dr. Murphy and Dr. Beyer, submitted in the course of the preliminary hearing, the transcripts of the preliminary hearing and the videotaped police interview of Petitioner.  CH Tr. Vol. IV, Exhibits, State's Exhibit 1, Report of Dr. Jeanne Russell at 2-3.

Following Dr. Russell's submission of her report, defense counsel requested that the court conduct a non-jury hearing on the issue of Petitioner's competency.  At the hearing, a considerable amount of testimony was presented on the issue of Petitioner's mental

---

[21]Petitioner had a prior juvenile record, having been charged with Robbery by Force and Fear.  He had been placed in the Southwest Oklahoma Juvenile Center in Manitou, Oklahoma, from September 20, 1997, through July 23, 1998, and was then granted parole. *See, e.g.,* CH Tr. Vol. IV, Exhibits, State's Exhibit 1, Report of Dr. Jeanne Russell at 2-3.

retardation. Dr. Drogin testified as an expert on behalf of the defense. According to Dr. Drogin, Petitioner met the diagnosis for mild mental retardation under the Diagnostic and Statistical Manual of Mental Disorders-IV.[22]  CH Tr. Vol. I at 127.  Dr. Drogin testified that Petitioner understood the charges that had been brought against him and further understood that death was a potential punishment for the offense charged.  CH Tr. Vol. I at 125-126. According to Dr. Drogin, however, Petitioner was not able to assist in his defense because of deficiencies in his cognitive thinking.  CH Tr. Vol. I at 66.  Dr. Drogin rendered this opinion based upon a number of tests he administered to Petitioner.  *See* CH Tr. Vol. I at 31-33 (Cognitive Capacity Screening Exam); 37-39 (Peabody Picture Vocabulary Test); 48-50

---

[22]The Diagnostic and Statistical Manual of Mental Disorders-IV (DSM-IV) is the definitive source for the classification of mental illnesses.  *See* American Psychiatric Association, The Diagnostic and Statistical Manual of Mental Disorders (4th ed.1994).  The DSM-IV categorizes an individual with an IQ between approximately 50-55 to approximately 70 as one suffering from mild mental retardation.  *Id*. at 40.  The DSM-IV then describes mild mental retardation as follows:

> Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable."  This group constitutes the largest segment (about 85%) of those with the disorder.  As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age.  By their late teens, they can acquire academic skills up to approximately the sixth-grade level.  During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress.  With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

*Id.* at 41.  The record indicates that Petitioner's IQ had been measured at scores ranging from 65 to 71 to 80.  *See* CH Tr. Vol. V at 405.  Dr. Drogin testified that Petitioner's IQ was around 66.  CH Tr. Vol. I at 83.  Dr. Russell testified that Petitioner's IQ was between 65 and 75.  CH Tr. Vol. I at 168.

(Competency Screening Test); 51-56 (Competency To Stand Trial Assessment Instrument). Dr. Drogin explained, however, that "no test of competency to stand trial will in and of itself tell you whether or not someone is competent." CH Tr. Vol. I at 49. Instead, he explained, the tests are "hopeful guidelines." *Id*. Dr. Drogin opined that Petitioner was not competent. CH Tr. Vol. I at 66, 90.

Dr. James Smith, a licensed psychiatrist, also testified on behalf of the defense. According to Dr. Smith, there is "no psychological test that will determine competence." CH Tr. Vol. II at 275. He relied mostly upon his interviews of Petitioner to reach his conclusion that Petitioner was not competent. When asked whether Petitioner would be capable of making a decision about his right to testify on his own behalf, Dr. Smith stated: "He will do, as many defendants would, do what his attorney says, but he won't comprehend what the implications are, what the alternatives, what the issues are that might come up on the stand." CH Tr. Vol. II at 277. Dr. Smith also opined that Petitioner had "such a misunderstanding" as to the courtroom and the roles of the various persons involved in the criminal proceedings. CH Tr. Vol. II at 278. According to Dr. Smith, Petitioner operated at the functional equivalent of a person between the ages of six and ten. CH Tr. Vol. II at 279.

During cross-examination, Dr. Smith testified that he had been able to question Petitioner about the facts of the crime during one of his interviews and that Petitioner provided essentially the same information as reflected in the videotaped interview with police. CH Tr. Vol. II at 287-288. Dr. Smith also testified that Petitioner was able to

telephone him on more than one occasion to seek his assistance in contacting his attorney. CH Tr. Vol. II at 280-281.

Dr. Shawn Roberson testified on behalf of the State regarding a supplemental competency evaluation of Petitioner. Dr. Roberson opined Petitioner did not suffer from mild mental retardation but that his intellectual functioning was from the borderline to low average ranges. CH Tr. Vol V at 399, 426, 429, 430. Dr. Roberson, like Dr. Russell, opined that Petitioner was competent. CH Tr. Vol. V at 441.

"Competency to stand trial is a factual question." *See Bryson v. Ward*, 187 F.3d 1193, 1201 (10th Cir. 1999) (citation omitted). The state court's factual findings regarding the competency determination are entitled to a presumption of correctness. *Id. citing* 28 U.S.C. § 2254(e)(1). *See also Rivera v. Beck*, No. 04-6317, 2005 WL 226249 at *2 (10th Cir. Feb. 1, 2005) (unpublished op.).[23] This presumption of correctness attaches to a state court's competency determination because such a determination "depends heavily on the trial court's appraisal of witness credibility and demeanor." *Thompson v. Keohane*, 516 U.S. 99, 111 (1995). To establish a right to federal habeas relief, Petitioner must rebut this presumption of correctness by clear and convincing evidence. *Bryson*, 187 F.3d at 1201. Moreover, "[a] federal court may not issue a writ of habeas corpus unless the state courts' competency decisions were based on an unreasonable determination of the facts in light of the evidence presented." *Id.*, *citing* 28 U.S.C. § 2254(d)(2).

---

[23]The unpublished opinions referenced in this Report are cited for their persuasive value in accordance with 10th Cir. R. 36.3(B).

The district judge reviewed a considerable body of evidence in determining the issue of Petitioner's competency pursuant to Petitioner's request for a non-jury hearing on the issue. CH Tr. Vol. V at 453-460. The district judge considered the testimony of the defense expert, Dr. Drogin. He also considered the competency evaluations and testimony of the State's experts, Drs. Russell and Roberson.  CH Tr. Vol. V at 457.[24]  In addition, he considered and viewed in its entirety the videotaped statement made during the course of the police interview on July 12, 1999. CH Tr. Vol. V at 458. The district judge also considered testimony of other "civilian witnesses" given in the course of the preliminary hearing. CH Tr. Vol. V at 458.

The district judge acknowledged Petitioner's diagnosis of some degree of mental retardation but concluded that Petitioner was not incompetent to stand trial. CH Tr. Vol. V at 459-460. The district judge was faced with controverted evidence regarding Petitioner's competency "[a]nd resolving the competency question depended heavily on [his] appraisal of witness credibility and demeanor."  *Bryan*, 276 F.3d at 1172 (internal quotations and citation omitted). Petitioner has failed to rebut with clear and convincing evidence the factual findings of the district judge.  Nor has Petitioner demonstrated that the district judge's

---

[24]The district judge also considered testimony of two defense experts who testified at the preliminary hearing, Drs. Lipman and Beyer.  He also considered expert opinion evidence from persons not testifying including reports of Dr. Murphy, Dr. Smith and Dr. Robertson. CH Tr. Vol. V at 455.

findings constitute an unreasonable determination of the facts in light of the evidence presented.  Accordingly, Ground Three of the Petition should be denied.[25]

### D.      Ground Four -- Sixth Amendment Speedy Trial Violation

In Ground Four of the Petition, Petitioner contends that his Sixth Amendment right to a speedy trial was violated.  In support of this claim, Petitioner again relies on the "interruption" of the determination of his youthful offender status by the court-ordered competency evaluations.  He does not offer any additional evidence of delay.  Because the Court has fully considered the issue of delay occasioned by the court-ordered competency evaluation in the context of Petitioner's due process claim as raised in Ground Two of the Petition, the Court need not further consider this claim.  The same analysis governs Petitioner's Sixth Amendment speedy trial claim, *see Barker v. Wingo*, 407 U.S 514 (1972), and the Court has fully analyzed those factors.  Therefore, Ground Four of the Petition should be denied.[26]

---

[25]This Court notes as further evidence that Petitioner was able to assist in his own defense his ability to follow counsel's direction that he not answer certain questions posed to him in the course of the competency evaluations on grounds that responding to such questions may jeopardize his Fifth Amendment privilege against self-incrimination.  He followed his counsel's advice even in the context of the supplemental evaluation during which counsel was not present. *See* discussion, *supra*, Ground One.

[26]On direct appeal, Petitioner raised the alleged due process and Sixth Amendment violations resulting from the delay in the determination of his youthful offender status as a single proposition of error.  *See* Response, Exhibit F, Appellant's Brief at 9-12.

### E.    **Ground Five -- Admission of Videotaped Police Interview**

Petitioner contends in his fifth ground for relief that the admission of his statement to police, made in the course of a videotaped police interview, violated his Fifth Amendment privilege against self-incrimination.  Petitioner gave this statement to police on the day after the commission of the crime after having voluntarily turned himself into police.  No charges had yet been filed.  Although Petitioner was given *Miranda* warnings and signed an Advice of Rights form waiving his rights, *see* PH Tr. Vol. VI, Exhibits, State's Exhibit 2, Petitioner contends he did not knowingly and voluntarily waive those rights.[27]

Petitioner further contends his statement was admitted without the trial court having conducted a *Jackson v. Denno* hearing to determine whether Petitioner had knowingly and voluntarily given the statement.[28]

### 1.    ***Jackson v. Denno* Hearing**

Pursuant to the Supreme Court's holding in *Jackson v. Denno*, 378 U.S. 368 (1964), when a defendant objects to the introduction of his statement as involuntary, due process

---

[27]On direct appeal, the OCCA deemed Petitioner's Fifth Amendment claim to be barred by the doctrine of *res judicata* as a claim that had previously been raised and adjudicated in Petitioner's appeal of the trial court's order denying his request for certification as a youthful offender.  The record demonstrates Petitioner relied on the same evidence to support his Fifth Amendment claim on direct appeal as that relied upon in the youthful offender appeal.  The OCCA summarily found the claim to be without merit in the youthful offender appeal.

[28]The claim of failure to conduct a *Jackson v. Denno* hearing was not included as part of Petitioner's challenge to the trial court's admission of the videotaped statement on direct appeal of his conviction.  The issue was raised, however, on appeal of the district judge's order denying youthful offender certification.  *See* Response, Exhibit C, Application for Accelerated Docket - Fast Track at 50-51.

requires a trial judge to make an independent determination that the statement is voluntary before permitting it to be heard by the jury.

The record reflects that prior to trial the trial court heard argument on Petitioner's motion to suppress the videotaped interview. *See* Transcript of Trial Motions, August 23, 2002. In support of the motion, defense counsel submitted excerpts of testimony from the preliminary hearing as evidence that at the time of the police interrogation, Petitioner was very tired and under the influence of PCP. In addition, defense counsel submitted testimony concerning Petitioner's mental retardation to show that Petitioner was not capable of knowingly and voluntarily waiving his rights.[29]

Both the prosecution and defense urged the trial court to view the videotape in its entirety before making a ruling on the admissibility of Petitioner's statement. *See* Transcript of Trial Motions at 7-8. The trial court agreed to view the videotape and took under advisement both the matter of the motion to suppress and defense counsel's alternative motion to redact portions of the videotape. *Id*. at 8-9

No record of the trial court's ruling on the motion to suppress has been submitted to this Court, and it appears that the reasons in support of the ruling were never made express

---

[29]At defense counsel's request, the trial court considered witness testimony elicited in the course of the preliminary hearing that directly addressed the issue of the voluntariness of the statement. Defense counsel submitted this evidence in support of the motion to suppress. *See* Transcript of Trial Motions, at 2-6.

The district judge presiding over the preliminary hearing had previously determined the videotape was admissible for purposes of determining probable cause and for its relevance to Petitioner's motion for youthful offender certification. PH Tr. Vol. IV at 411-414 ("I have reviewed the tape and determined that he was adequately advised of his Miranda rights and that it -- at least insofar as those types of issues might be concerned would be admissible.").

on the record.  However, at trial the prosecutor moved to admit a redacted version of the videotape. Trial Tr. Vol. II at 178-179.  Defense counsel acknowledged the trial court's prior ruling that the videotape was admissible, but renewed an objection to the admission of this evidence based on previous arguments in support of the motion to suppress.  Trial Tr. Vol. II at 176-177.   The trial court stood on its "previous ruling" overruling the motion to suppress.  Trial Tr. Vol. II at 177.   The redacted videotape was admitted into evidence and played to the jury.  Trial Tr. Vol. II at 178-179. Therefore, the record implicitly establishes the trial court's determination that Petitioner's waiver of his rights was made knowingly and voluntarily. *Compare Church v. Sullivan*, 942 F.2d 1501, 1515-1517 (10th Cir. 1991) (discussing propriety of federal district court's reliance on implicit findings of state court as to the voluntariness of a defendant's confession) (*citing Townsend v. Sain*, 372 U.S. 293 (1963) and *Sims v. Georgia*, 385 U.S. 538 (1967)).  Contrary to Petitioner's assertion, therefore, the trial court complied with the requirements of *Jackson v. Denno* before allowing the redacted videotaped statement to be admitted into evidence.[30]

---

[30]Even if a violation of *Jackson* occurred, the habeas relief to which Petitioner would be entitled is a new hearing on the issue of voluntariness. *Lucero v. Kerby*, *supra*, 133 F.3d at 1310. However, to be entitled to a new hearing, Petitioner must show that his version of events, if true, would require the court to determine his statement was involuntary.  *Id*. at 1310-1311. As discussed below, a review of the record does not establish that Petitioner's inculpatory statements were involuntarily given, and Petitioner has not offered any additional facts which, if proven true, would require a contrary result.

## 2.     Knowing and Voluntary Waiver of Fifth Amendment Right

Petitioner's claim that the waiver of his Fifth Amendment privilege against self-incrimination was not made knowingly and voluntarily is without merit.  "For a waiver to be knowing and intelligent, it 'must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'"  *Smith v. Mullin*, 379 F.3d 919, 933 (10th Cir. 2004) (*quoting Colorado v. Spring*, 479 U.S. 564, 573 (1987)).

"The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. 564, 574 (1987) "So long as [P]etitioner understood the basic principles that he had the right to remain silent and whatever he said could be used against him, his waiver was constitutionally adequate." *Wacker v. State of Kansas*, No. 99-3069, 2000 WL 123756 at *3 (10th Cir. Feb. 2, 2000) (unpublished op.).

At the preliminary hearing, Dr. Lipman, a neuropharmacologist who testified as an expert on behalf of the defense, opined that at the time Petitioner was questioned by police he was still under the influence of PCP.  PH Tr. Vol. II at 218-219.  Another defense expert, Dr. Richard Smith, a psychiatrist, reviewed the videotape of the police interview and similarly opined that Petitioner was still under the influence of PCP during this interview. PH Tr. Vol. III at 296.  Dr. Smith also opined, after reviewing the videotape, that Petitioner did not understand the "questions and procedures" or his *Miranda* rights and that Petitioner was highly suggestible.  PH Tr. Vol. III at 293-295, 330. Dr. Marty Beyer, a clinical

psychologist testifying for the defense, also gave an opinion about the police interview after reviewing the videotape and opined that Petitioner was not able to understand the waiver of his *Miranda* rights.  PH Tr. Vol. III at 372-373.

The videotape demonstrates that Petitioner told the interviewing police officers  that he was sixteen years old and had completed the ninth grade.  *See* Videotaped Police Interview [Doc. #31].  Petitioner signed the Advice of Rights form waiving each of the rights guaranteed by *Miranda* after the officers explained those rights to him.  The officers specifically told Petitioner that he did not have to talk to them, but Petitioner responded that he wanted to talk.

The videotape reveals that Petitioner initially expressed trouble remembering many details surrounding the commission of the crime.  Petitioner told the police that if he could rest, he might be better able to remember these details.  Following a period of rest and then further questioning by police, Petitioner disclosed the details of the crime.  Though, as one of the officers testified, the interview was not easy, *see* PH Tr. Vol. I at 112, the videotape shows that Petitioner understood the questions and ultimately provided an accurate and detailed description of the events of the crime.  The videotape thus is not contrary to a finding that at the time of his statement Petitioner could understand his right to remain silent and the consequence of waiving that right. *Compare Smith v. Mullin*, 379 F.3d 919, 934 (10th Cir. 2004) (fact that petitioner's cognitive abilities mirrored those of a twelve-year-old and that his memory was not wholly intact and his answers to police questions came slowly did not establish that he did not knowingly waive his rights).

The state court, both at the preliminary hearing stage and before trial, determined Petitioner's statement to the police was admissible.  The videotape itself, testimony of the police officers and other witnesses, and the testimony of experts were considered in making that determination.  The state court implicitly did not find the defense experts credible on the issue of Petitioner's mental ability to know and understand his rights and determined Petitioner knowingly waived his right to remain silent.  *See* PH Tr. Vol. IV at 411-413, Trial Tr. Vol. II at 177.  That determination is not unreasonable in light of the evidence presented in the state court proceedings.

Petitioner's challenge to the state court's determination of voluntariness of the statement also fails.  "Whether a confession was voluntary depends upon the 'totality of the circumstances,' including 'the crucial element of police coercion,' 'the length of the interrogation' and 'its continuity,' 'the defendant's maturity,' 'education,' 'physical condition,' and 'mental health,' and 'the failure of the police to advise the defendant of his rights to remain silent and to have counsel present during the custodial interrogation.'"  *Trice v. Ward*, 196 F.3d 1151, 1170 (10th Cir. 1999)  (*quoting Withrow v. Williams*, 507 U.S. 680, 693-94 (1993)).

In *Colorado v. Connelly*, 479 U.S. 157, 167 (1986), the United States Supreme Court held that coercive police activity is a necessary predicate to finding that a confession is not voluntary regardless of a suspect's mental condition.  *See also United States v. Lopez*, 437 F.3d 1059, 1064 (10th Cir. 2006) (in determining the issue of voluntariness, the personal characteristics of the accused are only relevant if the court first concludes the police officers

46

engaged in coercive conduct).  Petitioner's mental retardation and PCP use remain relevant, nonetheless, because these conditions may demonstrate Petitioner's susceptibility to police coercion and may demonstrate that police exploited Petitioner's weaknesses with coercive tactics.  *See Smith*, 379 F.3d at 935 (police may not exploit weakness associated with mental illness with coercive tactics) (*citing Connelly*).

Here, Petitioner has failed to demonstrate the essential element of police coercion. Officer Chuck Miller of the City of Lawton Police Department interviewed Petitioner and testified that he explained each of Petitioner's rights when he had Petitioner sign the Advice of Rights form.  PH Tr. Vol. I at 72-73.  Officer Miller testified that Petitioner appeared sober and further appeared to understand what was being explained to him.  PH Tr. Vol. I at 72-73. Petitioner told the officer that he had a ninth grade education, and the officer testified that Petitioner was able to read the information on the form on his own.  PH Tr. Vol. I at 73. Petitioner never indicated that he did not want to talk or that he wanted an attorney.  PH Tr. Vol. I at 74.

The videotape of the police interview demonstrates that the initial interview lasted about forty-five minutes.  *See* Videotaped Police Interview [Doc. #31]; *see also* PH Tr. Vol. I at 74.  Mid-way through that interview, Petitioner advised the officers a number of times that he was very tired and that he might be able to remember more of the details surrounding the crime if he were given the opportunity to rest.  The officers eventually granted his request for a rest, and the interview resumed several hours later.  The second portion of the interview lasted approximately one hour.  PH Tr. Vol. I at 74.  The officers did not threaten or coerce

47

Petitioner at any time during the interview and, although persistent, they were not overbearing in their questioning of Petitioner.

As the videotape demonstrates, Petitioner made the detectives aware that he had been under the influence of PCP at the time the crime was committed. However, he explained that immediately following the crime, he had returned to his grandmother's house and had slept for a number of hours. In fact, Petitioner indicated to the detectives that his grandmother was concerned Petitioner might become frightened and run, so she had him sleep off the effect of the drugs before allowing him to turn himself in.

Based on the Advice of Rights form signed by Petitioner and explained by the detectives, the willingness of the detectives to allow Petitioner a rest period during the interview, the cooperative tone of the interview and the benign conditions under which Petitioner was questioned, Petitioner has failed to demonstrate coercion. The fact that he had been using PCP, while relevant to the consideration, does not change this result as there is no indication that police used this to their advantage. *Compare Elliott v. Williams*, 248 F.3d 1205, 1212-1213 (10th Cir. 2001) (fact that petitioner had taken heroin did not impair his ability to give a voluntary statement).

Similarly, there is no evidence that the officers exploited Petitioner due to his limited intellectual capacity. *See Miller v. Dugger*, 838 F.3d 1530, 1537 (10th Cir. 1988) ("[K]nowledge that a suspect may have mental problems does not make the suspect's statement involuntary unless '[t]he police exploited this weakness *with coercive tactics*.") (alterations in original, *citing Connelly*). *See also Smith*, 379 F.3d at 934-935 (petitioner's

confession was voluntary even though he had the cognitive abilities of a twelve-year-old and low intellectual functioning where questioning was fairly gentle and tactics used by police did not overbear the petitioner's will); *William v. Nye*, No. 94-5522509, 1996 WL 195128 at *4 (10th Cir. April 23, 1996 (unpublished op.) (petitioner who had long history of mental illness, severe intellectual limitations and emotional and cognitive immaturity failed to establish the requisite police coercion to render his confession involuntary where he had told police he could read and write, he had completed the 10th or 11th grade and at time of questioning, police had only limited knowledge of his background). Indeed, both officers testified they were not aware of Petitioner's mental limitations. *See* Trial Tr. Vol. II at 148, 163-164, 189.

In sum, the determination of the state court that Petitioner's waiver of rights and statement to the police were made knowingly and voluntarily was reasonable in light of the evidence presented, and the OCCA's adjudication of Petitioner's Fifth Amendment claim did not result in a decision that is either contrary to or an unreasonable application of clearly established federal law. Ground Five of the Petition should be denied.

F.    **Ground Six -- Excessive Punishment**

In his sixth ground for relief, Petitioner contends that his sentence of life imprisonment is excessive and violates the Eighth Amendment prohibition against cruel and unusual punishment. As support for this claim, Petitioner contends that he should have been certified as a youthful offender and that failure to be certified as such "resulted in a far more

excessive sentence than [he] should have received under Oklahoma Statutes governing Youthful Offenders." *See* Petition at 20.

As previously set forth, Petitioner has no constitutional right to be tried as a youthful offender. Moreover, Petitioner has failed to establish that the state court determination to deny Petitioner certification as a youthful offender constitutes a violation of his federal constitutional rights.

The Eighth Amendment requires that a sentence not be disproportionate to the severity of the crime or involve unnecessary infliction of pain. *See Solem v. Helm*, 463 U.S. 277, 284 (1983). On habeas review, federal courts "afford wide discretion to the state trial court's sentencing decision, and challenges to that decision are not generally constitutionally cognizable, unless it is shown the sentence imposed is outside the statutory limits or unauthorized by law. *Dennis v. Poppel*  222 F.3d 1245, 1258 (10th Cir. 2000) (citations omitted).

Under Oklahoma law, murder in the first degree is punishable by life imprisonment, life imprisonment without the possibility of parole, or death. *See* Okla. Stat. tit. 21, § 701.9(A). "Generally, [habeas] review of a sentence ends once [the court determines] the sentence is within the limitation set by statute." *Dennis*, 222 F.3d at 1258 (citation omitted). Petitioner was sentenced to life imprisonment in accordance with the permissible range provided for by Oklahoma law. The nature of the crime Petitioner committed did not render the sentence he received disproportionate. Indeed, the United States Supreme Court has found a sentence of life without parole for a drug conviction to withstand Eighth Amendment

50

scrutiny.  *See  Harmelin v. Michigan*, 501 U.S. 957 (1991) (majority held that imposition of life in prison without parole for possession of 650 grams of cocaine did not violate Eighth Amendment). Petitioner's Eighth Amendment challenge to his sentence lacks merit. Therefore, Ground Six of the Petition should be denied.

### G.     Ground Seven -- Due Process Violation

In his final ground for relief, Petitioner contends that his due process rights were violated when the OCCA twice declined to exercise jurisdiction over his applications for a writ of prohibition or, in the alternative, writ of mandamus.  As Respondent points out, the claim raised in Ground Seven encompasses the claims raised in Petitioner's previous grounds for relief.  As previously discussed, Petitioner attempted to prohibit the competency evaluations ordered by the district judge during the course of the preliminary hearing and youthful offender certification proceedings.  As analyzed in relation to the claims raised in Ground Two of the Petition, the procedures employed in the context of the preliminary hearing and youthful offender proceedings constitute solely issues of state law.  The OCCA declined to assume jurisdiction over the applications filed by Petitioner, both times finding that the district judge was not exercising judicial power unauthorized by law.   Petitioner, therefore, has failed to raise a claim that implicates a violation of his federal constitutional rights, and Ground Seven of the Petition should be denied.

## RECOMMENDATION

It is recommended that the Petition for Writ of Habeas Corpus [Doc. #1] be denied.

## NOTICE OF RIGHT TO OBJECT

The parties are advised of their right to object to this Report and Recommendation. *See* 28 U.S.C. § 636.  Any objections must be filed with the Clerk of the District Court by May __31st__, 2006.  *See* Local Civil Rule 72.1.  Failure to make timely objection to this Report and Recommendation waives the right to appellate review of the factual and legal issues addressed herein.  *Moore v. United States*, 950 F.2d 656 (10th Cir. 1991).

## STATUS OF REFERRAL

This Report and Recommendation disposes of all issues referred by the District Judge in this matter and terminates the referral.

DATED this __11th__ day of May, 2006.

VALERIE K. COUCH
UNITED STATES MAGISTRATE JUDGE